We'll call the case of the United States of America and the Commonwealth of Pennsylvania DEP versus EMEHomer City Generation LP et al. Mr. Lundman. Yes. May it please the Court, Robert Lundman representing the United States. I'm joined by Claude Platten who represents the State of New York and will be speaking for the States. I'm going to use nine minutes, three of which I've used for rebuttal and Mr. Platten will use the remaining six minutes. All right. The rebuttal request is granted. Great. The District Court erred in dismissing the United States' complaint here based on a fundamentally flawed reading of the Clean Air Act. It is established at this stage of the case that Penelope and NYSEG modified the plan because we pleaded as much in our complaint. The modification triggers then the two obligations at issue here, the best available control technology obligation and the permit obligation. These are not just construction obligations. They are both ongoing obligations. Well, where is there any text that demonstrates that it is anything other than a construction obligation? I think there's three keys here in the statute itself and then beyond that we have both the federal regulation that's incorporated in the State Implementation Plan and the plan itself, starting with the statute. I have to, I don't mean to interrupt, but the section itself is called Pre-Construction Requirements. I mean, and in addition to what Judge Smith is saying. No, it's titled Pre-Construction Requirements and then section, the beginning of A says that nothing can be, may be constructed unless. So we're starting with this construction language, but that's what it is. It's the start and that's when the obligations begin. They're not obligations that end at construction. Where does the text indicate that? Well, the first place it indicates that is in A-4. That's where it says the proposed facility, this is the back obligation, the proposed facility is subject to the best available control technology. So it's not an obligation that arises and ends at construction, but rather it's. You're trying that 74-75-A-4? A-4. That no major immediate facility may be constructed unless, for the proposed facility is subject to the ACT. So you can't construct it unless it's subject to it, but what is subject to mean? It doesn't mean it's a construction obligation and only one. What it means is it's triggered at construction, but to be subject to BACT, it has to go beyond construction because BACT, and this isn't disputed, is something that controls emissions from the plant on an ongoing operational basis. So what happens is you modify your plan. That triggers the need to do things at the time of construction, but those obligations are not one-time construction only obligations. Throughout the statute, aren't there references to operations? I mean, a permit is a condition to operations. Congress knows how to use those lines. Well, and we do, and the other obligation we're talking about here is the one set forth in A-1, and that is the permit, and it's not just a construction permit. It's a permit that ends with a BACT permit. Is there anything in the statute that says that a PSD permit is a condition of operating a facility? There's nothing in the statute that says those words, but what we say is... But that's what you're arguing, isn't it? Right, but that's because that's what A-1 and A-4, which is underneath this construction requirement, what they impose. They impose ongoing pollution control technology, and if you look at A-4 and you look at what You go to then the definition of BACT, the definition of best available control technology, and that's in 74-79-3. That's not just a construction obligation. That is an emission limitation, and an emission limitation cannot apply solely at construction. It can't apply at all at construction, because during construction, the plant is off. It's being modified. New things are being added. The plant's not turned on. After construction is done, after the modification is built, we then have this ongoing obligation that's set forth in A-4 and then defined in 74-79-3, and that's an ongoing emission limitation. The key question here is, well, what happens when an operator of a plant doesn't modify some plant? We've plugged it, so that's established now, but then doesn't follow through and follow what A-1 and A-4 says? The defendant's and district court's argument here is, well, nothing happens. I mean, this whole issue comes from the fact that when Congress enacted the Clean Air Act, they knew there were these old plants out there. Right. Okay. And the industry said, look, we're not going to accept these new regulations on these old plants. And there was the fight back and forth in the 70s, and there was a decision that Congress made to say, okay, we're going to look prospectively here, and you old plants there, we're going to come to you when you modify your plants. Right. Right? Right. Okay. But what appears to me never happened, was a mechanism was never put in place to provide a trigger that when somebody did something, you would make a determination as to whether it was a modification that resulted in backed applying. Well, Congress decided not to make it, and you have to report everything you do to your plant, and then EPA must make a decision based on that report of whether to enforce. Rather, Congress said the deal, the compromise was, when you modify, you trigger this. But Congress didn't say with the specificity needed what modify meant. Well, this case isn't about, we've got modification established on appeal here because we pled modification. Okay. We'd be happy to go back to the district court and have a trial and fight out the modification issue. That's what we want. So the fact that modification may be a little vague doesn't impact what we have here. That's the next phase of this case. Okay. So, but what we have is a modification that's pled, and our argument, and we think the statute is completely consistent with this. Yeah. All right. So your argument is, at this point, that the court was, the district court was wrong in finding that the statute had run, and that the sections in question, particularly A-4, provided some continuing violations. Right. The A-4, particularly, imposes this ongoing emission limitation obligation that has to apply for it to make any sense beyond the time of construction. But if you're wrong, if you're wrong on that interpretation, the problem comes from the absence of any modification trigger, any notification trigger that was put in, that was failed to be put in the statute. Somebody should have been notified. Well there's no, I think Congress made the express decision to leave this to the government's enforcement authority. So that if- The express decision? No, there's no, there's no trigger as the district court described. There's a legislative history here in the general sense, which is that the Clean Air Act is not a discreet exercise of legislative authority. In fact, it's something of a patchwork over a period of time, isn't it? I mean, we've seen the development through a sort of evolution in a piecemeal way over a number of decades, right? Congress has had an opportunity, in fact, more than once, to add the kind of language I've suggested that I cannot see in 7475, is that correct? Well, Title 5 wasn't passed until 1989. Right, and we've signed the legislative history at that time where the joint statement of the committee managers said, we don't need to add operation because the EPA already has that authority. Well, where was that set? We set it in our brief. I don't have the site here, but it's our legislative history. It's a joint statement of the committee managers. I think it was a Senate committee report, and isn't it an after-the-fact reference? That piece of legislation, if I recall correctly, was never passed. No, it wasn't. I believe that was passed in 1990. That's what I had in Title 5. There was a debate, should we add operation somewhere in here, and the response from the committee managers was, we don't need to because it's already- We'll check that, but I mean, the fact of the matter is, as Judge Shigaris has suggested, we have the later step of an amendment that gives us Title 5, right? Right. Title 5 prohibits operating a source without complying with a Title 5 operating permit, right? Right. Uses the word operating. The PSD program contains no corresponding prohibition or enforcement authority, isn't that right? Well, that's where I disagree. Title 5 is an operating permit. We have Title 5 claims in here, and that's one way to resolve this case is to say that Title 5 is the vehicle here for an operating permit. Beyond the statute, let's say we're not clear on what the statute here is, and I haven't convinced you on that. The two other things I want to point to are the federal regulation, which is incorporated in the State Implementation Plan, 40 CFR 52.21J3. It says the modified facility shall apply the best available control technology. That's not a limited construction era statement. That is a broader operational statement. The second thing I want to point to is the state-specific State Implementation Plan provisions here. And if you look at those, and we've set those forth as our brief in a lot of detail, you have a plan approval permit, and you have a operating permit. And both of those require compliance with the operational requirements of the best available control technology provision. So if you go beyond the statute here, we think then things just get clearer, that these things are not just at the time of construction. I will grant you that by suggesting that things get clearer after the statute, that what you are assuming is that the statute isn't clear on the point that we seem to differ on, I've got to agree with you on that. I think given the clock, we should probably move to the other counsel for your side, and you will, of course, have rebuttal. And this is an important case, so we're willing to go beyond the time allotted. Thank you. Mr. Platton? May it please the court, Claude Platton of the New York Attorney General's Office on behalf of the states. Congress's intent with the PSD program is clear. It's clear in the face of the statute. The declaration of purpose at the outset shows that this is a scheme designed to regulate  And given that that intent is clear, the question is whether there's any barrier to construing section 7475 in a way that that effectuates that intent. May I ask a question that goes beyond the textual issues that I've touched on so far? And I could have asked this also of Mr. Lindman. Do you know, there is a request here for injunctive relief against the former owners, right? Can you provide me with a name or citation of any case where a court has issued a permanent injunction against former owners under the Clean Air Act, either to make changes to property they no longer own or to buy and retire emission credits? No, not under the Clean Air Act, Your Honor, but I don't think that's a problem for us. The precedent of this court is clear. I would agree that right now it would seem to be a problem for the other side, but it may be a problem to support. What authority do you base that upon? Well, the authority, there's no dispute that even on defendants' conception of the statute, we stated a claim that the former owners made modifications and violated the PSD program. So the question is simply whether the court in the full breadth of its equity powers, which are extremely broad, this court's precedent is made clear, that the extent of that power is particularly broad in situations involving the public interest, whether there's any way that the court could provide a remedy for that violation. The district court's error was finding on the face of the pleading that there's no possible way that any remedy could be crafted that would ameliorate the ongoing harm as that first. All right. So you think injunctive relief would be one way to remedy against the former owners? This case is all about, or fundamentally about, injunctive relief, Your Honor, and if we can't look to the current owners because of the conception... You say it is fundamentally about injunctive. That's the primary concern here is to stop the ongoing emissions of this power plant. That's right, Your Honor. But I'm not sure that I fully understand that argument. What we do know from longstanding authority is that Congress legislates against a backdrop of existing law, strong common law rules, and in this case, rules of equity when we're And Congress enacted the Clean Air Act against a strong backdrop of a rule of equity that the sole function of an action of an injunction is to forestall future violations. So what can a past owner do about future violations? Well, I disagree with that characterization of the background law, Your Honor. It's clear when the court was talking in those cases about prohibitory injunctions and the availability of a prohibitory injunction, and clearly in that situation, you have to show that there's a possibility of future violation or an ongoing harm, but there's no question that the court has broad remedial powers to provide a remedy for past violations as well. Let me ask you straight out. What would an injunction look like? What would the injunction you seek look like against the former owners? Well, we've proposed a number of options. The most straightforward would be if the current owners can't be compelled to remedy the ongoing uncontrolled emissions, then the former owners could either take steps to install the scrubbers to pay for them to be installed. That's the most direct way, but clearly the most direct way is for the current owners to be enjoined. And there are other... And short of that... But we're not asking right now about the current owners. And we all know that injunctive relief is extraordinary relief. We know that it is inherently something that is best reposed in a district judge, in a trial judge, in a chancellor who has all the facts and factors available to him or her. And practicality... And of course, we review then on abusive discretion. Practicality in actually enforcing that injunction is a factor a chancellor is going to take into account. What's the practicality here? What are the obstacles that a district judge sitting as a chancellor in equity is going to face in trying to order former owners to somehow interface with current owners and make this work? Doesn't that seem to you to be inherently unpractical, impractical? It seems to me more difficult, but difficulty is not a basis to dismiss a claim on the face of the pleadings. We're not talking about a claim now. We're talking about a remedy. A remedy. That's right, Your Honor. A claim exists or it doesn't exist. If it doesn't exist, you don't have the remedy. Right. And when the claim exists, to dismiss the complaint on the basis of the difficulty of implementing a remedy is an extraordinary thing to do. It's clear that the district court could do it if any remedy at all would be impossible, but that simply can't be decided on the face of this complaint, that nothing, whether it's imposing, installing scrubbers, or doing something else to offset ongoing emissions from this plant is simply impossible, and that's a categorical error. If I could make one point regarding the obligation of the current owners here. It's clear that Congress often addresses ongoing harms through the imposition of specific statutory obligations or prohibitions that arise at a particular time, and that's exactly what we have here, and in that situation, when Congress's intent is clear that the intention is to prevent an ongoing harm, a court can construe the obligation as arising at that time but continuing for so long as the harm continues. We've cited a number of cases in our briefs regarding that point. The escape from federal custody is one example in which the Supreme Court recognized that the act, the statute prohibited escape from custody, but that the violation continues until the escapee returns to custody, and that is an additional reason why you can and should construe the statute consistent with legislative, with Congress's clear intent on the face of the statute that's imposing an ongoing obligation. Mr. Plante, let me ask you one question. Maybe it's more appropriately posed to Mr. Lundman, but if your only hook here is the hypothetical, if we conclude that the federal statutes and the federal regulations in place do not cover operation, and only the Pennsylvania SIP is a hook that you can prevail on, can a regulation, which this would be, exceed the statutory authority? Well, the regulation, so long as it is entitled to deference and is federally enforceable, so if you find that the SIP... I'm not talking about that. Can Pennsylvania enact the regulation? Could New York enact the regulation that exceeded the scope of the statutory authority given to the state in enforcing the Clean Air Act? Well, yes, I believe it could, and the SIP is also enacted pursuant to the Pennsylvania Air Pollution Control Act. I understand that, but if the Air Pollution Control Act didn't cover it, and the Clean Air Act didn't cover it, can a regulation properly be enacted to go beyond the enabling statutes? Unless it's inconsistent with the statute, then yes, I believe it could. That's a large unless here. Unless. That's right, Your Honor. Depending on how we interpret the statute. That's right, our argument is focused fundamentally on the statute and the federal regulations. So you would say unless inconsistent? Yes, I believe that. Mr. Platton, I will ask you a question that maybe Mr. London will want to address in his rebuttal as well, but you're not arguing, are you, that if this court were to affirm the district court that the EPA and the states lack the authority and the ability statutorily or through regulatory authority to otherwise control emissions at the Homer City plant, are you, that there's nothing else that can be done in futuro to regulate those emissions? It may be possible that the EPA or Pennsylvania could do it. New York and New Jersey could not. This is the only avenue open to us, to New York and New Jersey, to enforce our rights under the Clean Air Act. So I can't say for certain that there's no possibility, but the fact that there may be an administrative solution doesn't foreclose the possibility of an enforcement action here. I understand, and I will ask Mr. London to address that. Thank you very much, Mr. Platton. Mr. Thompson? Good morning, Your Honor. If it pleases the Court, Chet Thompson on behalf of EME Homer City and the Homer City owner lessors 1 through 8, which I'll refer to as the current owners. To address a point, Judge Smith, that you just raised, and something that the government leaves out throughout their argument, is the fact that pre-construction review is just one of myriad programs under the Clean Air Act to abate pollution. And in fact, as we cite in footnote 17 of our brief, Homer City is installing state-of-the-art controls as we speak on Units 1 and 2 that will reduce SO2 emissions by more than 95%. So again, this is being done under the Clean Air Act, but separate from the program. Now, addressing the couple of points that the government just made, I just heard them say that there are no barriers to construe the statute the way that they suggest. Let me stop you at that first point you made. Does the fact that those plans are going forward, does that impact the claim that's being made here? The plans that are going forward to upgrade, to update the units in question? Well, I don't think legally it affects. Should it impact the remedy of an injunction in any way? Well, Mr. Elwood is going to speak to the issue as to what's appropriate injunction to the former owners. With respect to the current owners, we, of course, believe that no injunction collide because there's no underlying violation that we can be held responsible for. But I think it's best that Mr. Elwood address that issue. Can I ask you a question? It's more than a hypothetical. Going to the Title 5 claims, if a current owner is actually aware that there was some flaw in the Title 5 application, they know. They were told, they could see there's a problem. Would there be a cause of action against them under Title 5? No, there would not be. Even if they knew that, hey, I bought the plan, I knew there was a problem, I'm going to see how far I can get with this, with that? Well, it's probably as you intended it. It's a multi-layered response. First, just to be clear, there are no such allegations here. No, no, I'm asking a hypothetical. I would say that what happens with the current owners, they would then have new obligations under Title 5 to amend their Title 5 permit if, in fact, new applicable requirements become subject. And Title 5 has a long process to go through if, in fact, new requirements become applicable. And you go through an amendment, public comment, and then ultimately those are incorporated into your Title 5 permit. But with respect to whether actions of a prior owner creates liability on a subsequent owner, we think not. And the reason for that is because Section 113B is very clear as to where liability lies. It lies against such person that violates the act. And here, the violation that the government alleges is constructing without a permit. Because on page 29 of the district court's opinion, they conclude, I think kind of broadly, that the current owners couldn't have known the Title 5 app was flawed. You know, we're at a very early stage in this litigation. I'm not sure how the district court can come with a broad brush and come up with that conclusion. Well, I guess I have a few responses to that. One, facts matter here. This Title 5 permit was being reviewed by PADEP and EPA for nine years. For nine years they reviewed this permit. The current owners got it in 2004. They operated pursuant to it for seven more years before this action. So the government sat on its hands for 20 years. Now, with respect to whether they could have known that an action that happened ten years before they acquired the facility back in 1991, that an action might have triggered new source review, I think that's what Judge McVeary was getting to. You know, the dockets are full of these types of cases. It's very difficult to conclude whether or not prevention of significant deterioration was triggered, hence all the litigation. So the point was there was no way a subsequent owner who comes in five years already into a permit review process and ultimately gets a permit issued by the permitting authority could have known that they had an obligation to go back and double-check the application submitted by the prior owners. What about the Pennsylvania SIP? I think this is a red herring, Your Honor, because the Pennsylvania SIP is identical. It's an analog to the federal program. So under the Pennsylvania SIP, there are operating permit requirements and there are construction permit requirements. This is not like the Tennessee SIP that the Sixth Circuit found so important in its holding. In Tennessee, there was a requirement in the Tennessee SIP that said if you failed to get a construction permit, you have an ongoing obligation to go get a construction permit. Nothing like that, nothing that the government can point to in the Pennsylvania SIP says that. It says you have an obligation to get a construction permit before construction and you have to get an operating permit before operating. We could not, the current owners could not get a construction permit for a project they did not construct, and we have been operating pursuant to an operating permit ever since we acquired the facility. So we submit that, again, with all due respect to the government, they are throwing spaghetti on the wall hoping something sticks. There is nothing under the Pennsylvania SIP here. But under 127.25, it says a person may not cause or permit the operation of a source. Without an operating permit, and we have an operating permit, the government does not allege that we don't have an operating permit, we do. In the same way we have a Title V permit. So going back, so the barrier that the government speaks to, no barrier to their interpretation, there is a barrier. It's called the unambiguous language of the Act. And the Act is very clear that Congress knew they did it in Section 111. In Section 502, those provisions prohibit operating without a permit. That is not what 165 says. It talks about construction. We disagree with their legislative history to the extent the court dives into this. You will see that Congress debated whether to amend their enforcement authority to allow the enjoining of operation, and Congress chose not to do that. So, again, I think that we have to view 165 against the backdrop that Congress knows how to create operating permit programs versus construction permit programs. They also point to 5221R and the regs. Number one, the regs can't control here. We think this is Chevron 1. We think the unambiguous language of the statute controls. And even if one looks at 5221R, as cited by Mr. Lundman, all that says is you can't operate without a permit. Well, that, to me, reinforces what 165 says, is you cannot construct without a permit. It says nothing about operate. And I would ask that on rebuttal you have the government point out where it says operating in any of the statute or the regulation. With respect to Title V, I'll just say one closing remark. There is a part of Section 504F that creates a permit shield that says no facility that has a permit and is operating pursuant to a permit can be sued for a violation of Title V. It's called a permit shield. The provision is labeled permit shield. If the government was true here that you could bring these deficient Title V claims, it would just eviscerate that provision. It would have no meaning to have a permit shield if whenever the government wants to bring an enforcement action, they can claim that the permit shield is not in effect. The district court didn't deal with the permit shield, right? That's correct. So unless there are any questions. Thank you very much, Mr. Thompson. Mr. Elwood for the former owners. May it please the Court, John Elwood for the former owners, New York State Electric and Gas and Pennsylvania Electric that sold the plant to the current owners of the lower 14 years ago. To begin with your question, Judge Smith, about whether the installation of state-of-the-art scrubbing equipment affects the availability of remedies, we believe it does because it directly goes to the necessity of injunctive relief against the former owners. We have always taken the position that it was essentially impossible for us to get involved here because, you know, you have to build the very large scrubber equipment and then you have to handle the interface. Now we have their scrubber and their plant, and nobody has explained what role the former owners could have in affecting the current owners' operation of their scrubber with their plant. Now because we didn't hear about the scrubber until our side of the case, we don't know what the government is going to say, but to the extent that the government has any problem with the operation of the scrubber, query what role the former owners have to play in sorting that out. Injunctive relief I think is also unnecessary for the further reason that, again, there's no question that we haven't had any involvement in the plant, ownership of it or operation of it for 14 years. We haven't had any violation for 14 years. There's no question that there isn't any risk of a future violation. So regardless, I mean, the district court didn't make any finding about whether that is an absolute determinant, but it's very hard to say that the utter absence of a risk of future violation has no role to play in the decision whether it's appropriate to grant injunctive relief. And when they haven't made any sort of plausible allegation that we could violate the statute in the future, it's very hard to see why there should be a permanent mandatory injunction against the former owners who haven't had a role in the plant for a while. In addition to the – we haven't heard much about the other provisions of the Clean Air Act, but I want to point out some of the other provisions which account for the current owners installing these scrubbers. They were – we briefed this to the district court, but it didn't rely on them. But, I mean, you have the Clean Air Interstate Rule, which sets a cap on SO2 emissions and basically requires plants – or establishes a cap and trade system to go under it. That was a plan under which the plant has been buying credits for a while in order to comply with it. So, I mean, again, another overlapping remedy. There's the Mercury and Air Toxic Standard, which goes online in April 2015, which regulates both mercury and it establishes standards for SO2. And when you're scrubbing it, it involves the same sort of technology as scrubbers. And when you – the Federal Register notice for that regulation made reference to the fact that when you're cleaning out mercury, you're also cleaning out SO2. And that goes on – the scrubber that is being built now is planned to go online right before the Mercury and Air Toxic Standard goes into force in April of 2015. Mr. O, this question maybe has not so much legal significance, but is a product of my own curiosity. Remind me, if you would, please, what was the change or modification that was made by your clients back when they owned the plant before ownership was transferred? The modification – well, the alleged modification, which I think we would say is merely routine maintenance, was, I believe, to the boiler. And it involves, you know, the brazes for the boiler, the ducting for the boiler. In addition, the states argue that pendant heaters were changed in 1995 and 1996. What's occurred to me as I've spent time with this case is that, first of all, modification seems to be something of a squishy term, if you will, or at least is subject to considerable discretion. At the very least, and I understand very well the enforcement concerns that the EPA and the states would have with respect to that. But on the other hand, it also seems to me that an owner is running an awful lot of risk by undertaking changes, some construction, even substantial maintenance, with the potential that it might later be considered a modification by the regulatory entities. Am I correct in that? I believe that's absolutely correct. And if that's true, was there some kind of – and this is where the curiosity comes in – was there any kind of mechanism, any kind of process used or available back in the 1990s that your clients could have availed themselves of to go to the EPA or go to the Commonwealth of Pennsylvania and say, we propose doing this, what's your regulatory position, is this a modification or not? The Clean Air Act does, I believe, create a position, does create authority that you can go and seek some sort of advisory opinion, but it is not required. Was there anything like that process followed? No, I do not believe that anything was followed in this case. But, I mean, again, it is a very subjective process. And the position which the government is advocating here and which they told the Seventh Circuit this in as many words in argument is, if they're correct, if we guess wrong about modifications, we're on the hook for potentially another century. It doesn't matter whether it's going on. If there's still unabated pollution going on, we are potentially on the hook at that point for being hailed into court and being responsible for providing injunctive relief. And, you know, given the kind of open-ended liability that there is under this provision, it really is disastrous for former plant owners. So your position would, and not that it's that important to the issue before us today, but your position is at odds with what counsel for the EPA indicated their position was on modification. There was no question these were modifications and they're ready to proceed under those circumstances. Well, if there was no question there were modifications, query why it took them 20 years to, you know, seek to enforce against it. But in any event, you know, their position here is that they have alleged modifications and we're stuck with that because of the way it comes to us. But as the court below recognized, it's a very open-ended question whether they're modifications or not. Judge Smith asked about the risk of proceeding forward without getting some kind of advisory opinion or some regulator to come in and ascertain whether or not your work is a modification. If this was 1998 or from your, I think, the former owner's 1991, if this was 1994, you would have some risk for having commenced construction without having sought a permit, would you not? Yes, there would be some risk commencing construction without a permit. That's correct. Okay. Is there no further questions? Thank you. I will try to get through the court's questions that were lodged earlier. Starting just with the modification, the last issue we were talking about, it may be squishy. It may be complicated. That's the issue we think this case should be about. Was the plan modified? If it was modified, we should ultimately prevail. If not, they'll win. But balancing the complaint at the threshold on the motion to dismiss, we think then guts this protection of the statute when a plan is modified and then sold, then both the current owner and former owner are both off the hook on the district court's reading. You would agree if under your interpretation a former or current owner could be bond in perpetuity to have that question raised? There's a doctrine called latches that addresses exactly the situation. When has the government taken or a party taken too long? Absent latches. Absent latches. I don't know where the end point would be. These are complicated issues. They hold the cards. Typically not because what we're doing here is enforcing a public health benefit. It's not EPA or the Department of Justice's fault. It may be our fault, but the people downwind of the plan are the ones who suffer. But latches is effectively a defense, if you will. The delay here could be a factor, could it not, in the equation that a district judge uses for determining whether or not injunctive relief. Sure, yes. The injunctive standard provides for that sort of consideration, the public interest, the balance of harms. But that's the remedy determination. We didn't get to that here. The district court bounced our complaint as a matter of law. We would be happy to go back, get to that phase, argue all four permanent injunction factors, including public interest and balance of harms. But our precedent also calls for, I mean, you can't take a leisurely pace. An older case called actually Olds holds that. Isn't that a problem for the government? Well, I think it's only a problem if it becomes one. I don't think it is a problem. The former owners are the ones who made the changes. The current owners buy the plant. They get access to all the documents. We're on the outside looking in. They didn't come to us and do what the statute provides for with the kind of up-front analysis and determination of is it going to be a modification or not. That provides for then monitoring to determine if it triggers it down the road. But we didn't do any of that. Talking about down the road, the existence of this plant isn't exactly a secret. No. It's very visible from a lot of roads. From Altoona to Pittsburgh. From Altoona to Pittsburgh. I see it every time I do the job. I'm not aware of it in New Jersey. You've got other problems in New Jersey. This plant itself might be a bad example of that because it is so visible. But it's hard for me to believe that there was not a federal regulator or a state regulator on the site at that plant that would have asked the question sometime, either at the time pre-construction, post-construction, or right in the middle of construction, do you guys have your permits? Did you come to get the permits to make what we think appears to be a modification? It's hard for me to believe that it took 20 years to get to that question. Well, it is 20 years now. The question came up earlier. I did want to touch quickly on their mention of they're putting on new scrubbers. It's not the first time we've been down the road of we're putting on new scrubbers. It's all okay. The record is incomplete on both the new scrubbers, what happened in the interim period. Time passed. We looked at it. We brought suit. The pollution from the plant is ongoing and uncontrolled, and that's why we're looking for an injunction to control that pollution. So it's not a voluntary action by them. But you have other hooks. We don't have other hooks. We have no other hook that provides for best available control technology. This is the only hook that provides for that limit. You just gave a permit. You just granted a permit for an upgrade at the same units that you're fighting here in court about today. The Title V permit was issued by the state. The Citizens Against Ruining the Environment case from the Seventh Circuit, I think, looks at this very clearly and explains it very well. That permit issuance, the court explains, issuing that permit shouldn't be held up by an enforcement case. I asked Mr. Plotin and indicated I would ask you, are you arguing that if we affirm the district court here that EPA and the states have available to them no statutory or regulatory authority to control emissions at Homer City? We have authority. There's other things that can be done, but none of them are what we're seeking for here. What are they? Well, one example is this cross-state air pollution rule that EME Homer City just had vacated, the D.C. Circuit vacated it as a successful case. That would have impacted or reduced the amount of pollution from this plant impacting downwind states. We think that's a good rule. The D.C. Circuit vacated it. We're back to the drawing board on that. What civil and or criminal remedies might be available? Well, one option that they suggest in their briefing, and they mention there are all these options, is amending the entire state implementation plan. We don't think it makes sense to amend a plan to focus on pollution coming from a single plant. The plan should stand by itself, and then when a plant violates the plan, we enforce against it. But none of these other potential solutions get us to the emission limitations specified by the best available control technology. And that is what we want for sulfur dioxide from this plant, because that is what has the public health impacts from it. I just had one question as well, sort of a follow-up on what I asked one of your friends across the aisle there. If the current owners knew that the Title V application was flawed, is there a cause of action against them? I think so, and I think we have a cause of action short of proving knowledge. And this is the cause of action we've alleged. I think Mr. Thompson was too dismissive of what we've claimed. We claim that they have an inadequate permit for the plant under Title V, and that's our claim against the current owners. That's irrespective to their level of knowledge. Well, if district court didn't assess their knowledge. District court said that they couldn't have known that the Title V app was flawed. Right, and I think that's. Is there a problem with that statement? Yes, it's not in the record. We didn't plead it. It's, you know, they put on proof showing that they didn't know. We could rebut it, and we'd be off and running either summary judgment or trial. But what they would know is that there is a facially valid Title V permit, right? Well, they have a Title V permit, yes. We don't think it's facially valid because it doesn't include the limitations triggered by the modifications. So it's inadequate, and I think that is a perfect Title V claim, that the permit itself does not cover the plant as it exists. It covers the pre-modification plant, not the post-modification plant. So they have a permit, but not for the plant that they have. With respect to the injunction, I just want to make one point. We did talk about delay quickly, briefly. The district court's theory, though, doesn't turn on barring the injunction because of the passage of time, but rather because of the transfer of ownership. It says you can't get against the current ones or the former ones for an injunction, not because of time passage, but because the plant was sold. These plants are sold frequently. We think that is a really damaging ruling for EPA's enforcement efforts, in that when a plant is sold, then both parties are off the hook, and that's one of the primary reasons why we're seeking reversal here. Thank you, Mr. Lindholz, and thank you to all of counsel. This is a complex case, a difficult case, a very interesting case, numerous interests, very valid interests at stake here. We'll take the matter under advisement. Thank you all.